[No. A107926. First Dist., Div. One. Aug. 31, 2005.]

MARK W. FALKOWSKI et al., Plaintiffs and Appellants, v.
IMATION CORP. et al., Defendants and Respondents.

GREGORY A. ELLIS, Plaintiff and Appellant, v.
IMATION CORP. et al., Defendants and Respondents.

COUNSEL

Glancy Binkow & Goldberg, Lionel Z. Glancy and Neal A. Dublinsky for Plaintiffs and Appellants.

Dorsey & Whitney, Diane J. Mason, James K. Langdon II and Thomas M. Jancik for Defendants and Respondents.

OPINION

MARGULIES, J.—

## I. INTRODUCTION

Plaintiffs in this class action were employees of Cemax-Icon, Inc. (Cemax) at the time of its merger with defendant Imation Corp. (Imation). The merger resulted in Cemax becoming a wholly owned subsidiary of Imation, with plaintiffs continuing as employees of Cemax. At the time of the merger, Imation replaced plaintiffs' Cemax employee stock options with options to purchase Imation stock. Soon after the merger, Imation granted plaintiffs future rights to additional Imation stock options. A year later, Imation sold Cemax to another company and cancelled all of plaintiffs' unexercised Imation stock option rights.

The incentive stock option plans under which plaintiffs' options had been issued permitted Imation to cancel the option rights if plaintiffs' employment

with Imation or its affiliated corporations terminated. Plaintiffs contend that because they were never terminated from employment with Cemax, which continued as an operating corporate entity after its sale by Imation, the cancellation of their option rights constituted a violation of the terms of these plans. The parties submitted cross-motions for summary judgment in the trial court. The superior court granted judgment to defendants, concluding that when Cemax ceased to be a subsidiary of Imation, plaintiffs' employment with Imation or its affiliates ended. We affirm.

## II.  BACKGROUND

Plaintiffs are all employees or former employees of Cemax, a company that designs and sells medical image information networks. In 1986, 1992, and 1996, Cemax or its predecessor corporations[1] enacted three distinct employee stock option plans (Cemax option plans). Each of the Cemax option plans empowered the board of directors to grant options for the purchase of Cemax stock to persons employed by Cemax or its affiliated corporations. Each plan allowed for the issuance of both "incentive stock options," which are given preferential tax treatment by the Internal Revenue Code, and "nonstatutory stock options," which do not qualify for preferred tax treatment. Plaintiffs were granted stock options under one or more of the Cemax option plans.

In May 1997, Cemax entered into an "Agreement and Plan of Merger" (Merger Agreement) with Imation. Following the merger, Cemax retained its separate corporate form, operating as a wholly owned subsidiary of Imation. Persons who were employees of Cemax before the merger therefore continued as employees of Cemax after the merger. The Merger Agreement provided that any employee stock option issued pursuant to the Cemax option plans "shall be converted into, without any further action on the part of [the merging corporations] or the holder thereof, a substitute option" to purchase shares of Imation, according to a specified conversion formula. The merger was completed in August 1997.

Although the Merger Agreement stated that the Cemax stock options would be converted "without any further action on the part of" Cemax and Imation, in fact Imation took two steps to implement the conversion. First, Imation required each Cemax optionholder to execute an amendment to his or her stock options (Stock Option Amendment). The Stock Option Amendment converted the optionholder's existing options for the purchase of Cemax

---

[1] Cemax was created in 1995 by the merger of Cemax, Inc. and Icon Medical Systems, Inc.

stock into options for the purchase of Imation stock, altered the terms of option exercise in a manner not relevant here, and provided that "[i]n the event of termination of the Optionee's Continuous Status as an Employee, the Optionee may, but only within thirty (30) days . . . exercise the Option to the extent that Optionee was entitled to exercise it at the date of such termination. To the extent that Optionee was not entitled to exercise the Option at the date of such termination . . . the Option shall terminate."

Second, Imation issued a prospectus regarding the amended Cemax option plans (Prospectus). The Prospectus described the plans, mentioned certain amendments made to the outstanding options to bring them into compliance with the terms of the Merger Agreement, and incorporated the texts of the Cemax option plans, copies of which were attached to the Prospectus. In addition, on the page preceding the attached copies, under the title "Imation Corp. Stock Option Plans for Employees of Cemax-Icon, Inc.," the Prospectus stated that the incorporated plans were being amended in two ways: "(i) every reference to Cemax-Icon or the 'Company' contained in each Plan shall be a reference to Imation Corp.; and (ii) every reference to Common Stock contained in each Plan shall be a reference to Imation Corp. Common Stock . . . ."

In January 1998, Imation granted additional options for the purchase of Imation stock to at least some of the employees of Cemax, including some or all of plaintiffs. The awards were made through a "Stock Option Acknowledgment" issued by Imation to the employees. The right to exercise the options granted in the Stock Option Acknowledgment vested one-half at the beginning of 1999 and one-half at the beginning of 2000. The Stock Option Acknowledgment also stated that the granted options expired on January 5, 2008, or sooner, according to the terms of Imation's employee stock option program (Imation option plan). The Imation option plan stated that "all rights . . . are automatically forfeited by the Participant thirty days following the date of termination of employment . . . ."[2]

On August 3, 1998, barely a year after the merger, Imation announced that it was selling its medical imaging business to Eastman Kodak Company (Kodak). As part of that transaction, ownership of Cemax was to be transferred to Kodak, with Cemax continuing as a separate corporate entity with a

---

[2] Recipients of the new options also were expected to execute a "Stock Option Agreement," which stated that "Participant shall automatically forfeit all rights under the Option 30 days following the date of Participant's termination of employment with the Company or any Subsidiary . . . ." We have been provided with no evidence, however, that plaintiffs ever executed such a document.

new corporate parent. The sale closed on November 30, 1998. As occurred at the time of the Imation merger, persons who were employees of Cemax before the sale to Kodak continued as employees of Cemax after the sale.

Imation took the position that the sale of Cemax to Kodak operated as a termination of the Cemax employees' "Continuous Status as an Employee" under the amended Cemax option plans and as a termination of the "employment" of those employees for purposes of the Imation option plan. As a result, Imation required Cemax employees to exercise any vested Imation stock options within 30 days and deemed all rights to their unvested Imation stock options, including the future option rights granted under the Stock Option Acknowledgment, to be forfeited.

Plaintiffs filed an action in the superior court in September 1999, alleging causes of action for fraud and negligent misrepresentation, Labor Code violations, and breach of contract in connection with the forced exercise of their vested options and the termination of their rights to unvested options. Joined with Imation as defendants were William T. Monahan, at relevant times the chairman, president and chief executive officer (CEO) of Imation, and Bradley T. Sauer, who served as the CEO of Cemax after the merger. Defendants removed the case to federal court, contending that the fraud causes of action were preempted by the Securities Litigation Uniform Standards Act of 1998, title 15 United States Code sections 77p, 78bb(f)(1)–(2). (See *Falkowski v. Imation Corp.* (9th Cir. 2002) 309 F.3d 1123, 1127.) The Ninth Circuit ultimately found that removal was proper, that the Labor Code claims failed to state a cause of action, and that the fraud claims were not pleaded with sufficient particularity. (*Id.* at pp. 1131–1134.) The Ninth Circuit remanded the surviving breach of contract claims to the district court (*id.* at p. 1134), which in turn remanded the case to the superior court for want of a federal question.

After remand, the court certified a class with five subclasses.[3] Class members were Cemax employees who acquired option rights to purchase Imation stock following the Cemax merger and remained employees of Cemax at least through October 13, 1998.[4] Each class member was assigned to one or more subclasses according to the plan or agreement under which the employee's stock option rights were originally acquired.

---

[3] Prior to certifying the class, the judge consolidated two actions, *Falkowski et al. v. Imation Corp. et al.* (Super. Ct. Alameda County, 1999, No. H209331-6) and the later-filed *Ellis v. Imation Corp. et al.* (Super. Ct. Alameda County, 2002, No. 02-052976). This appeal is from judgment in the consolidated action.

[4] On October 13, 1998, Imation first announced to Cemax employees its position that the sale to Kodak caused the forfeit of their unexercised options.

Following discovery, the parties filed cross-motions for summary judgment. Other than information about the relevant corporate transactions, neither party submitted extrinsic evidence regarding the creation of the various option plans and their related amending documents; rather, both motions rested on the language of the operative legal documents themselves, as placed in the context of the merger and subsequent sale.[5] In a detailed opinion, the trial judge reviewed the relevant contract provisions subclass-by-subclass and concluded that there were no material facts in dispute, that the Cemax option plans were not ambiguous, and that their terms, as amended, permitted the termination of plaintiffs' option rights upon the sale of Cemax to Kodak. The trial judge also noted that plaintiffs had conceded that defendant Sauer was not liable and found that defendant Monahan had acted only within the course and scope of his employment as CEO of Imation. Judgment was accordingly entered in favor of all defendants.

## III. DISCUSSION

Plaintiffs do not argue that any disputed issue of material fact precluded summary judgment or that any of the relevant contractual documents should be disregarded as void. Rather, they argue that a proper interpretation of the operative documents, read together, required a finding that the sale of Cemax to Kodak did not terminate the Imation stock option rights granted to Cemax employees prior to October 1998. Although we find that the language of the documents is ambiguous in these circumstances, we conclude that the trial court properly interpreted the amended stock option plans.

### A. *The Law of Contract Interpretation*

When faced with a dispute over the meaning of a contractual provision, the court must first determine whether the provision is ambiguous, i.e., whether, on its face, the language of the provision is capable of different, yet reasonable interpretations. (*Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1552 [48 Cal.Rptr.2d 627]; *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 848 [44 Cal.Rptr.2d 227].) If an ambiguity is found, the court must determine which of the plausible meanings the parties actually intended. (Civ. Code, § 1636; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Curry v. Moody,*

---

[5] Plaintiffs did submit limited extrinsic evidence to demonstrate that they were treated by Imation as employees of Cemax, rather than Imation, and that Cemax was treated as a separate corporate entity from Imation. For purposes of this appeal, we assume both of these facts to be true and undisputed.

at p. 1552.) When the parties offer no extrinsic evidence concerning the meaning of the contractual language, or when the extrinsic evidence offered is not in conflict, ascertaining the intended meaning is solely the duty of the court. (*St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1048 [124 Cal.Rptr.2d 818]; *Southern Cal. Edison Co. v. Superior Court,* at p. 851.)

In determining which of the plausible meanings was intended, we are required to deduce the parties' intent from the language of the contract alone, if possible. (Civ. Code, § 1639; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505].) Accordingly, at least in the first instance, contractual interpretation turns on "what was intended by what was said—not what a party intended to say." (*Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal.App.3d 615, 622 [220 Cal.Rptr. 411].) In evaluating the contractual language, however, we also " 'tak[e] into account all the facts, circumstances and conditions surrounding the execution of the contract.' " (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544 [54 Cal.Rptr.2d 128], quoting *Floystrup v. City of Berkeley Rent Stabilization Bd.* (1990) 219 Cal.App.3d 1309, 1318 [268 Cal.Rptr. 898].)

B. *The Language of the Option Plans*

Our first task is to determine whether the language of the option plans is ambiguous—that is, whether, on its face, the language is susceptible to both of the meanings urged by the parties. Plaintiffs claim that their option rights could not be terminated unless their employment with Cemax was terminated, while defendants claim that plaintiffs' option rights could be terminated once Cemax was no longer a subsidiary of Imation, regardless of whether plaintiffs continued in Cemax's employ. Because the relevant terms are contained in several provisions and amendments, we must first determine what the applicable language is.

The parties agree that the language governing termination under the Cemax option plans is contained in the Stock Option Amendment, a document executed by each optionholder after the merger. The Stock Option Amendment had the effect of inserting into each Cemax option plan a provision stating, "In the event of termination of the Optionee's Continuous Status as an Employee, the Optionee may, but only within thirty (30) days . . . exercise the Option to the extent that Optionee was entitled to exercise it at the date of such termination. To the extent that Optionee was not entitled to exercise the

Option at the date of such termination . . . the Option shall terminate." Thus, Imation's ability to terminate plaintiffs' option rights turns on the meaning of "the Optionee's Continuous Status as an Employee."

The 1986 and 1992 Cemax option plans defined the term "Continuous Status as an Employee" as "the absence of any interruption or termination of service as an Employee . . ." and provided that the employee's continuous status would not be terminated by "sick leave, military leave, or any other leave of absence."[6] In turn, these plans defined "Employee" as "any person . . . employed by the Company or any Parent or Subsidiary of the Company." The 1996 Cemax option plan stated that the term " 'Continuous Status as an Employee . . .' means that the employment . . . relationship with the Company, any Parent or Subsidiary is not interrupted or terminated. Continuous Status as an Employee . . . shall not be considered interrupted in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, any Subsidiary, or any successor." Accordingly, for each Cemax option plan the meaning of "Continuous Status as an Employee" turns in part on the definition of "Company," since continued employment with the "Company" or its affiliates is the determining factor in each.

The Prospectus amended the text of each Cemax option plan by stating that "every reference to Cemax-Icon or the 'Company' contained in each Plan shall be a reference to Imation Corp." Incorporating this change into the original language of the 1986 and 1992 Cemax option plans, the definition of "Employee" becomes "any person . . . employed by [Imation] or any Parent or Subsidiary of [Imation]." In turn, inserting this language into the definition of "Continuous Status as an Employee" in those plans, the term's definition becomes "the absence of any interruption or termination of service as a [person . . . employed by Imation or any Parent or Subsidiary of Imation]." Using the same insertions, the definition of "Continuous Status as an Employee" in the 1996 Cemax option plan becomes "the employment . . . relationship with [Imation], any Parent or Subsidiary is not interrupted or terminated."[7]

---

[6] "Optionee's Continuous Status as an Employee" was given initial capital letters in the Stock Option Amendment, as though it were a defined term, but the amendment does not define it. The Stock Option Amendment refers back to the original option plans for the definition of capitalized, but undefined, terms.

[7] We discuss the definition of "Subsidiary" in the Cemax option plans in the next section of this opinion. For purposes of this section, we give "Subsidiary" its commonly accepted meaning—a corporation in which Imation owns, directly or indirectly, a controlling voting interest. (See Corp. Code, § 189; *Gigax v. Ralston Purina Co.* (1982) 136 Cal.App.3d 591, 601–602 [186 Cal.Rptr. 395].) It is undisputed that after the sale to Kodak, Imation no longer owned any interest in Cemax.

The termination language of the Imation option plan stated that "all rights . . . are automatically forfeited by the Participant upon the date of termination of employment . . . ." The plan defined "Participant" as "any employee of Imation who is designated as a Participant . . . ." "Imation," in turn, was defined as "Imation Corp. and such subsidiaries or affiliates as may be designated by the Board of Directors from time to time."

## C. Construing the Language of the Option Plans

### 1. The Cemax Option Plans

Plaintiffs argue that their option rights did not terminate when Cemax was sold to Kodak because their employment relationships, which had always been with Cemax rather than Imation, were not changed by the sale. Their interpretation focuses on that portion of the definition of "Continuous Status as an Employee" that requires "the absence of any interruption or termination of service" (1986 and 1992 Cemax option plans) or "the employment . . . relationship . . . is not interrupted or terminated" (1996 Cemax option plan). Because they never left the employ of Cemax, plaintiffs argue, they had neither an "interruption" nor "termination" of their "service" or "employment . . . relationship."[8]

Defendants, on the other hand, focus on the portion of the definition of "Continuous Status as an Employee" that requires "service as [a person . . . employed by Imation or any Parent or Subsidiary of Imation]" (1986 and 1992 Cemax option plans) or an "employment . . . relationship with [Imation], any Parent or Subsidiary" (1996 Cemax option plan). While plaintiffs' employment relationship with Cemax might not have been altered by the sale to Kodak, defendants argue, the sale ended any employment relationship plaintiffs had with Imation or an affiliated corporation of Imation, since Cemax was no longer affiliated with Imation after the sale.

Both of these interpretations are reasonable on the face of the amended plan language. The ordinary meaning of an "interruption or termination of service" is an employee's separation from his or her employer, whether voluntary or involuntary. Because plaintiffs did not separate from Cemax, there was no interruption or termination of their employment. Plaintiffs' definition is therefore plausible, although it is not a perfect fit for the plan

---

[8] In connection with their arguments, plaintiffs have requested that we take judicial notice of various dictionary definitions pursuant to Evidence Code section 451, subdivision (e). Their motion is granted.

language because it does not account for the fact that, after the sale, plaintiffs were no longer "employed by [Imation] or any Parent or Subsidiary of [Imation]."

Defendants' construction is also both reasonable and incomplete. The ordinary meaning of "terminate" is "to end,"[9] and plaintiffs' employment "relationship with [Imation], any Parent or Subsidiary" came to an end with the sale. This construction is imperfect, however, because it takes no account of the ordinary meaning of the phrase "interruption or termination" of employment, which requires a severance of the employee's underlying employment relationship. Adopting defendants' interpretation requires us to equate Imation's sale of Cemax with Cemax's termination of plaintiffs' employment.

Because we find both proposed interpretations to be facially reasonable, we deem the Cemax option plans, as amended, to be ambiguous. It is therefore our duty to resolve the ambiguity by determining the meaning actually intended by the parties' language, taking into account " 'all the facts, circumstances and conditions surrounding the execution of the contract.' " (*Frankel v. Board of Dental Examiners, supra,* 46 Cal.App.4th at p. 544.)

A contractual interpretation is preferred that gives effect to all of the contract's terms. (Civ. Code, § 1641; *Jordan v. Allstate Ins. Co.* (2004) 116 Cal.App.4th 1206, 1219 [11 Cal.Rptr.3d 169].) While plaintiffs' interpretation accords with the common understanding of "termination of employment," it fails entirely to account for the clear reference in each of the option plans to termination of employment *with Imation or one of its affiliates.* Under plaintiffs' interpretation, they would be entitled to continue to receive the benefits of their stock options even after they no longer had any professional connection to Imation, in apparent violation of the contractual requirement that a relationship with Imation (or its affiliates) not be "terminated." Defendants' interpretation, although it requires adoption of a broader construction of the phrase "termination of employment" than is ordinarily understood, satisfies all elements of the definition of "Continuous Status as an Employee" by insisting on a continued employment relationship with Imation or its affiliates. Defendants' interpretation is therefore a better fit with the language of the contractual provision, considered as a whole.

Plaintiffs' interpretation also fails to further the purposes for which the incentive stock option plans were created. Neither party has provided us with

---

[9] The first definition of "terminate" listed in Webster's dictionary is "to bring to an end; put an end to." (Webster's College Dict. (2001) p. 1350.)

extrinsic evidence bearing directly on the intent of Cemax and Imation in enacting their plans; nor is there any evidence of representations by Imation regarding the availability of options under the circumstances presented. We therefore rely only on the language of the plans themselves to determine the intent behind them. Each plan contains a statement of purpose noting that it was created to attract good employees, encourage them to remain with the company, and reward their hard work. This accords with the understanding in the case law that the primary purpose of stock option plans is the "attraction and retention of desirable employees." (*Langer v. Iowa Beef Packers, Inc.* (8th Cir. 1970) 420 F.2d 365, 368 (*Langer*).) We assume that the plans would attract good employees by making available to them an ownership interest beyond salary compensation, encourage employees to remain with the company by conditioning exercise and continued receipt of options on their continued employment, and reward hard work by providing a form of compensation having a value directly tied to the company's success.

None of these purposes would be served by continuing to make Imation stock options available to employees of Cemax after the sale. First, since new employees of Cemax would not be eligible to receive Imation options under the plan after the sale, the plan would become ineffective in attracting new employees. Second, the continued availability of stock options to employees of Cemax after the sale would not encourage the retention of employees by the issuing corporation—Imation—or its affiliates, since Cemax would no longer be an affiliate. Third, the stock options would no longer constitute a reward for the hard work of the Cemax employees, since their work could no longer enhance the value of Imation stock. In short, once Cemax's employees no longer worked within the corporate structure of Imation, it served no contractual purpose for Imation to continue to make incentive stock options available to them. Defendants' interpretation recognizes this by terminating option rights at the time of the sale.

Because defendants' interpretation is in better accord with the language of the Cemax option plans, read as a whole, and is more consistent with the articulated purposes of those plans, we conclude that defendants' interpretation embodies the intention of the parties.[10]

---

[10] Plaintiffs rely heavily on *Dearlove v. Genzyme Transgenics Corp.* (Pa.Ct.Com.Pl., July 9, 2003, No. 081218) 2003 Phila.Ct.Com.Pl. Lexis 26, an unpublished decision from a Pennsylvania trial court, in arguing their position. The trial judge in *Dearlove*, faced with essentially the same facts and arguments before us, concluded that both interpretations of the contractual language were reasonable, as we have. Because the trial judge declined to choose between the two interpretations, a luxury not available to us, his decision provides no guidance on the ultimate issue. (*Id.* at p. 19.)

## 2. *The Imation Option Plan*

The Stock Option Acknowledgment by which plaintiffs were granted options under the Imation option plan stated that the options expired on January 5, 2008, or "earlier than said date under certain circumstances described in the Plan (See Section 10 of the Plan)." Section 10 of the Imation option plan stated that "all rights . . . are automatically forfeited by the Participant thirty days following the date of termination of employment . . . ." As noted *ante,* "Participant" was defined as "any employee of Imation who is designated as a Participant . . . . ," while "Imation" was defined as "Imation Corp. and such subsidiaries or affiliates as may be designated by the Board of Directors from time to time." In a letter that accompanied the Stock Option Acknowledgment, Imation's CEO explained, "If your employment with Imation is terminated for any reason other than death, permanent disability or retirement . . . , your option is forfeited on the date your employment is terminated."

While we recognize that the termination language of the Imation option plan is not quite identical to that of the Cemax option plans, the differences are not substantial enough to change our interpretation. The Imation option plan refers merely to termination of "employment" as causing a forfeit of option rights, rather than employment *with the company,* as found in the Cemax option plans. Standing alone, this would lend weight to plaintiffs' interpretation, which premises termination only upon the termination of plaintiffs' existing employment relationship with Cemax. The phrase does not, however, stand alone. "Participants" are defined as persons who are employees of Imation or its affiliates, suggesting that termination as an employee of Imation would end participation in the plans. This implication was made express in the CEO's accompanying letter, which stated that termination of "your employment with Imation" would cause a forfeit of option rights. The CEO's letter is properly considered in determining whether the language of the Imation option plan is reasonably susceptible to the interpretation proffered by defendants. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350–1351 [8 Cal.Rptr.3d 649] [" ' "all credible [extrinsic] evidence concerning the parties' intentions" ' " must be considered by the court " ' "to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party" ' "].) While the termination language of the Imation option plan alone favors plaintiffs' interpretation, since it does not contain the critical language employment "*with the Company,*" the definition of "Participant" and the CEO's letter both suggest that termination of employment *with Imation* is implicit in the text. As a result, we conclude that the language of the Imation option plan contains

the same ambiguity as the language of the Cemax option plans, in that it can reasonably support both plaintiffs' and defendants' interpretations.

The stated purpose of the Imation option plan is identical to that of the Cemax option plans: "The purpose of this program is to provide a strong incentive for employees to remain with Imation and to exert added effort toward its growth and success by affording these employees an opportunity to acquire or receive shares of Imation's common stock . . . ." For the same reasons discussed above in connection with the Cemax option plans, plaintiffs' interpretation would run counter to these purposes, while defendants' interpretation is consistent with them. Accordingly, we must conclude that defendants' interpretation was the one intended by the parties.

D.  *Section 424(f) of the Internal Revenue Code*

■   Each of the Cemax option plans defines "Subsidiary" as "a 'subsidiary corporation,' whether now or hereafter existing, as defined in Section 424(f) of the [Internal Revenue] Code."[11] In turn, section 424(f) defines a " 'subsidiary corporation' " as, in general terms, a corporation that was a subsidiary of the parent corporation "at the time of the granting of the option."[12] Plaintiffs argue that under the plain language of section 424(f), if their employer was a corporate subsidiary of Imation at the time their options were granted, the employer would remain a "Subsidiary" of Imation *for purposes of the Cemax option plans* even if it ceased to be a subsidiary of Imation in fact. If this construction is applied, plaintiffs argue, they continued to work for a "Subsidiary" of Imation even after Cemax's sale, thereby continuing to qualify for the stock options under the plain language of those plans. Because the Imation option plan does not refer to the Internal Revenue Code, the stock options granted pursuant to it are not subject to this argument.

For three distinct reasons, plaintiffs' argument for the application of section 424(f) is unavailing. First, if the plain language of section 424(f) were

---

[11] The 1986 and 1992 plans actually cite section 425(f) of the Internal Revenue Code, but there is no substantive difference. Congress recodified section 425 as section 424 in 1990, when it repealed former section 424. (Pub.L. No. 101-508, § 11801(c)(9)(A)(i) (Nov. 5, 1990) 104 Stat. 1388-524.) For simplicity, we will refer throughout to the statute's current codification as section 424(f).

[12] The actual language of section 424(f) is not quite so straightforward: "For purposes of this part, the term 'subsidiary corporation' means any corporation (other than the employer corporation) in an unbroken chain of corporations beginning with the employer corporation if, at the time of the granting of the option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain."

applied, it appears that plaintiffs would never have qualified as employees of a "Subsidiary" of Imation. Section 424(f) defines " 'subsidiary corporation' " as "any corporation (other than the employer corporation) . . . ." Because Cemax was plaintiffs' "employer corporation," Cemax could not have been a "Subsidiary" with respect to plaintiffs' employment under the literal terms of section 424(f).[13] In addition, in order to qualify as a " 'subsidiary corporation' " under section 424(f), the subsidiary must have been owned by the parent "at the time of the granting of the option." Because all of the options granted under the Cemax option plans were originally granted *prior to* Cemax's merger with Imation, Cemax would not qualify as a " 'subsidiary corporation' " for purposes of these options.[14] If Cemax did not qualify as a "Subsidiary" of Imation under the terms of section 424(f), application of that definition would not salvage plaintiffs' claims.

Second, even if plaintiffs had shown that the literal language of section 424(f) would result in the retention of their option rights, we would be unwilling to give effect to that language under the present circumstances. Civil Code section 1638 requires us to apply the literal language of a written contract unless that language would "involve an absurdity." (Civ. Code, § 1638; see *Sierra Vista Regional Medical Center v. Bonta'* (2003) 107 Cal.App.4th 237, 245 [132 Cal.Rptr.2d 9]; *National Enterprises, Inc. v. Woods* (2001) 94 Cal.App.4th 1217, 1229 [115 Cal.Rptr.2d 37].) We find such an absurdity here. Applying section 424(f)'s definition of " 'subsidiary corporation' " would have made it impossible for Imation to grant options to Cemax's employees since, for the reasons stated above, such persons would not have qualified as employees of the "Company" or a "Subsidiary," a requirement for persons to become eligible to receive options under the Cemax option plans. Since Imation clearly intended for plaintiffs to receive viable option rights, applying the literal meaning of section 424(f) would make a mockery of both corporations' efforts to provide equivalent stock option rights to plaintiffs after the merger. Even if this were not the case, applying the rule of "once a subsidiary, always a subsidiary" would undercut the purposes for which incentive stock option plans are created. As discussed

---

[13] While title 26 United States Code section 424(g) requires the substitution of " 'grantor corporation' " for " 'employer corporation' " in the definition of section 424(f) under some circumstances, the Cemax option plans make no reference to section 424(g).

[14] While plaintiffs contend that the substitution of Imation options at the time of the merger constituted a new "grant" of the options, this argument fails under federal tax law. To constitute a new "grant" of options, the substitution must have constituted a "modification" of the Cemax stock options under title 26 United States Code section 424(h)(1). (See *Hope v. United States* (D.La. 1985) 617 F.Supp. 439, 442, affd. (5th Cir. 1986) 803 F.2d 816.) The substitution of new options at the time of a "corporate merger, consolidation, acquisition . . . or liquidation" is ordinarily deemed not to be a "modification" of the old options. (26 U.S.C. § 424(a), (h)(3)(A).) Plaintiffs have not even attempted to demonstrate that, contrary to the ordinary rule, the Imation substitution constituted a modification for purposes of section 424(h)(1).

*ante*, once employees have left the corporate structure of the corporation issuing the options, the continued availability of those stock options no longer serves any business purpose of the issuing corporation. Neither the employees' labor nor their continued employment redounds to the corporation's benefit. Further, the options no longer provide any "incentive" because the employees' eligibility to receive the options comes to depend upon their continued employment with a corporation that no longer has any connection to the issuing corporation. For all these reasons, it would lead to absurd results to apply a rule that continues to characterize a corporation as a subsidiary when it no longer is, in fact, a subsidiary.

Finally, we note that the plans' incorporation of section 424(f) was presumably intended to ensure that the stock options granted under the Cemax option plans qualified as "incentive" stock options under the federal tax laws. (See fn. 16, *post.*) Because the Stock Option Amendment states that the substitute options granted to plaintiffs "shall no longer be treated as an incentive stock option under federal income tax laws," this purpose became moot after the merger. The original justification for using a definition of "subsidiary" consistent with the language of section 424(f) was no longer present.[15]

Because we find application of the literal definition of "Subsidiary" to be inappropriate in these circumstances, we apply the term's commonly understood meaning: a corporation in which the parent, Imation, owns, directly or indirectly, a controlling voting interest. (See Corp. Code, § 189; *Gigax v. Ralston Purina Co., supra,* 136 Cal.App.3d at pp. 601–602.) Our previous conclusion regarding the proper interpretation of the plans is therefore unchanged.

Plaintiffs point out that rejecting the literal application of section 424(f) would place us in conflict with dictum of the Texas Supreme Court in *Monsanto Co. v. Boustany* (Tex. 2002) 73 S.W.3d 225 [45 Tex. Sup. Ct. J. 497] (*Monsanto*). In *Monsanto,* employees of a corporate subsidiary of Monsanto were granted options to purchase Monsanto stock. After Monsanto sold the subsidiary, it refused to honor the stock options. (*Id.* at pp. 227–228.) The Texas Supreme Court found, consistent with our holding, that once the

---

[15] We also reject plaintiffs' argument that the inclusion of the phrase "now or hereafter existing" in the definition of "Subsidiary" is significant in this context. The phrase is plainly intended to ensure the inclusion of both subsidiaries existing at the time of execution of the plan ("now . . . existing") and those created afterward ("hereafter existing"). It does not suggest that corporate subsidiaries are intended to continue to be "Subsidiaries" even after they have been sold.

subsidiary ceased to be a subsidiary of Monsanto, the employment of the subsidiary's employees terminated for purposes of the stock option plan. (*Id.* at pp. 230–231.) The plaintiffs argued, however, that under the definition of " 'Subsidiary' " contained in the stock option plan, their employer did not cease to be a subsidiary, despite its sale. The stock option plan contained two alternative definitions of " 'Subsidiary,' " depending upon the type of stock option issued.[16] (*Monsanto*, at pp. 230–231) For purposes of nonstatutory stock options, " 'Subsidiary' " was defined as a corporation of which Monsanto owned more than 50 percent. (*Id.* at p. 231.) For purposes of statutory, or incentive, stock options, " 'Subsidiary' " was defined as a corporation that was a subsidiary at the time the options were granted. (*Id.* at p. 230.) The latter definition incorporated much of the language of section 424(f), although the plan did not expressly refer to the Internal Revenue Code. (*Monsanto,* at pp. 230–231, fn. 2.) The court rejected the plaintiffs' argument because their options were nonstatutory stock options, but it opined in dictum that the plaintiffs would have prevailed had they possessed incentive stock options. (*Id.* at p. 231.)

We differ with the Texas court's dictum for two reasons. First, the practical problems presented here by the application of the definition in section 424(f) were not present in *Monsanto*. As noted, the plan language in *Monsanto* was similar, but not identical to, that of section 424(f); in particular, the definition contained in the *Monsanto* plan did not include section 424(f)'s exclusion of the " 'employer corporation' " as a " 'subsidiary corporation.' " Further, the *Monsanto* plaintiffs' employer was, in contrast to our situation, a subsidiary of Monsanto at the time the options were originally granted. Because of these differences, there was no risk that employees of the subsidiary would be disqualified from eligibility to receive options by application of the literal language of the plan. Second, in making its dictum pronouncement the Texas Supreme Court did not consider whether adoption of the rule "once a subsidiary, always a subsidiary" was consistent with the overall purposes of the plan before it. As noted above, we conclude that adoption of a definition requiring continued issuance of stock options after a subsidiary is sold would not serve the parties' purposes in enacting an employee incentive stock option plan.

---

[16] The Internal Revenue Code recognizes two types of employee stock options. If an employee stock option satisfies the conditions specified in title 26 United States Code section 422(b), thereby qualifying as an "incentive" or "statutory" stock option, the employee is not required to recognize taxable income upon either the grant or exercise of the option; the employee recognizes income only upon sale of the purchased stock, generally at favorable capital gains rates. (26 U.S.C. §§ 421(a)(1), 422(a); *Schwieger v. Iowa Beef Processors, Inc.* (8th Cir. 1986) 802 F.2d 1032, 1033.) Recipients of "nonstatutory" stock options—i.e., those that do not satisfy the requirements of section 422(b)—must recognize income at the time of either grant or exercise of the stock options, as well as any capital gain upon sale of the stock. (26 U.S.C. § 83(a); *Robinson v. C.I.R.* (1st Cir. 1986) 805 F.2d 38, 40.)

## E. *Plaintiffs' Other Arguments*

Plaintiffs' remaining arguments do not seriously challenge our reasoning regarding the meaning of the language of the plans.

Plaintiffs first argue that they should be deemed third party beneficiaries of the Merger Agreement, thereby permitting them to enforce Imation's commitment in that agreement to issue substitute options that are "subject to the existing terms and conditions of the [plan] governing the Outstanding Stock Option immediately prior to the [closing date]." We find it unnecessary to decide whether plaintiffs were third party beneficiaries of the Merger Agreement because we reject the premise of their argument—that defendants violated the Merger Agreement by amending the Cemax option plans to condition termination of option rights on termination from employment with Imation or its affiliates. The Merger Agreement's commitment to issue substitute options subject to the "existing terms and conditions" cannot, as plaintiffs argue, be interpreted to require that the terms and conditions of the Cemax option plans remain entirely unchanged. Because the agreement expressly anticipated that Cemax stock options would be converted into Imation stock options, the parties necessarily also anticipated that changes consistent with this substitution could and would be made to the option plans. The existing plans stated that optionholders' rights would terminate upon termination of their employment with the issuing corporation—Cemax—or its affiliates. The amendment, which stated that optionholders' rights would terminate upon termination of their employment with *Imation* and its affiliates, effectively preserved this provision by tying termination of option rights to employment with the *new* issuing corporation. The change was therefore consistent with the substitution of options; indeed, such a change was necessary to preserve the "existing terms and conditions." For the same reason, we reject plaintiffs' argument that the substitute options were not an equivalent option for purposes of the Cemax option plans.

Plaintiffs also argue that because paragraph 4 of the Stock Option Amendment states that "[a]ll capitalized terms used but not defined herein shall have the meanings given to them" in the Cemax option plans, the defined term "Continued Status as an Employee" must be interpreted to depend upon employment by Cemax or its affiliates. Plaintiffs' reasoning rests on the flawed premise that the Stock Option Amendment "froze in time" the "original" meaning of the terms in the Cemax option plans. The Stock Option Amendment contains no language precluding the Cemax option plans from being amended by other documents. It merely requires the meaning of capitalized terms to be determined by reference to the Cemax option plans, without in any manner dictating the content of those documents. As explained

*ante*, the Prospectus amended the definition of the defined term "Company," which in turn changed the meaning of the defined term "Continuing Status as an Employee" in the Cemax option plans. Paragraph 4 provides no basis for disregarding this change.

Plaintiffs' reliance on *Langer, supra*, 420 F.2d 365 is misplaced. In *Langer*, the decedent had executed an employment contract that granted him stock options after two years of employment. (*Id.* at p. 367.) Less than a month after his stock options had vested, his employer sold the division for which he worked without prior warning. When the decedent tried to exercise his options, the employer refused to comply, claiming his employment had been terminated. (*Ibid.*) The Court of Appeals, interpreting the employment agreement, held that the parties could not have intended for the decedent to "give full consideration" for the options yet be deprived of the opportunity to exercise them. (*Id.* at p. 369.) Unlike the decedent in *Langer*, plaintiffs were never denied the right to exercise options they had already earned. The various option plans all allowed optionholders 30 days in which to exercise any options that had already vested. The sale of Cemax denied them only the right to obtain future option grants that would have vested had they continued in employment.

Plaintiffs' arguments premised on the fact that they were never employees of Imation are simply irrelevant. The various stock option plans did not require them to be employees of Imation in order to be eligible to receive stock options; it was sufficient for them to be employees of either Imation or one of its affiliated corporations. As employees of Cemax, they satisfied this requirement.

In an argument restricted to options issued under the 1996 Cemax option plan, plaintiffs assert that the provision stating that "Continuous Status as an Employee . . . shall not be considered interrupted in the case of . . . transfers between locations of the Company or between the Company, its Parent, any Subsidiary, or any successor" precluded termination of their option rights upon sale of Cemax. The language simply has no application here. Even assuming it is accurate to characterize the sale of assets as a "transfer" of Cemax, the 1996 plan addresses only transfers of *employees*. No employee transfers occurred as a result of the sale to Kodak; all Cemax employees before the sale continued to be Cemax employees after the sale.

Plaintiffs also contend that the sale to Kodak violated section 4.05 of the "Key Management Agreement" (KMA), a form agreement entered into individually by certain plaintiffs with Cemax around the time of the merger with Imation. The KMA bound the signing employee to a two-year term of employment with Cemax following the merger in return for certain compensation guarantees, including the continued availability of the substitute options for a period of time following the merger. We do not reach the

substance of plaintiffs' claims under the KMA because the current defendants were not parties to the KMA. Plaintiffs argue that Imation was "at minimum, . . . an <u>implied</u> party to the KMA," but they cite no authority supporting, or even entertaining, the purported doctrine of "implied party."

█ In fact, plaintiffs' true contention appears to be that the KMA constituted an implied *contract* between plaintiffs and Imation. Even if we accept plaintiffs' premise that a preexisting written contract can constitute an implied contract binding on a nonsignatory, their argument would fail. Plaintiffs assert that the KMA required Imation to continue to make available the promised option rights after the sale of Cemax. In contrast, we have interpreted the option plans as permitting Imation to terminate those rights. Accordingly, plaintiffs' argument necessarily requires the KMA to be interpreted to impose obligations on Imation that are different from (and inconsistent with) the obligations contained in the various stock option plans. This would violate the fundamental rule that an implied contract cannot override the terms of an express agreement between the parties. (See, e.g., *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172 [114 Cal.Rptr.2d 109]; *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1387 [88 Cal.Rptr.2d 802] ["[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results"].)

Plaintiffs' arguments are no more compelling with respect to the Imation stock option plan. The arguments are focused on the mistaken assumption that the option plan required covered employees to be employees of Imation, which they contend was a "factual impossibility." As noted above, to be covered by the option plan an employee needed only to be employed by Imation or one of its subsidiaries. Since Cemax was, at one time, a subsidiary of Imation, there was nothing impossible about plaintiffs' coverage under the plan.

Finally, there is no basis to hold defendant Monahan, then the CEO of Imation, personally liable on these contracts. Plaintiffs cite only Restatement Second of Agency (Restatement), section 156, which states that when an agent signs an agreement as an agent, the agent will be personally bound unless he or she indicates his or her agency status on the document. Assuming the Restatement section applies in these circumstances, Monahan signed his name above his printed corporate title in executing the relevant documents, thereby giving adequate indication of his status as corporate agent. There is no evidence that Monahan ever gave any of the plaintiffs reason to believe that he intended to be personally liable for the issuance of options under any of these plans.

## IV.  DISPOSITION

The judgment of the superior court is affirmed in all respects.

Marchiano, P. J., and Stein, J., concurred.

A petition for a rehearing was denied September 27, 2005, and the petition of appellants Mark W. Falkowski et al., for review by the Supreme Court was denied November 30, 2005.