Filed 3/6/26  Razo v. Andersson CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALEXANDER RAZO et al., | |
| Plaintiffs and Respondents, | G063747 |
| v. | (Super. Ct. No. 30-2020-01158055) |
| MELISSA ANDERSSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge. Reversed. Appellant's request for judicial notice denied. Respondents' motion to strike denied.

Horvitz & Levy, Frederic D. Cohen, Jason R. Litt; Carney Mehr and Kendra L. Carney Mehr for Defendant and Appellant.

Plante Huguenin Lebovic Kahn, Brian C. Plante and Gregory M. Golino for Plaintiffs and Respondents.

*     *     *

This is a dispute between homeowners, Melissa Andersson on the one hand, and Alexander and Danielle Razo (the Razos) on the other, who live in adjoining spaces and who are the only two members of a homeowners association (the Association). Andersson wanted to make changes to her patio that would have required changes to the Razos' walkway. The Razos were not agreeable, but Andersson proceeded anyway. The Razos filed the instant action claiming Andersson's changes violated the Association's Covenants, Conditions, and Restrictions (CC&Rs). The CC&Rs prohibited an owner from making changes to the "exterior appearance" of their home without Association approval. However, the CC&Rs allowed an owner to unilaterally make changes to certain areas, including a patio. The trial court expansively interpreted the "exterior appearance" language to include changes to Andersson's patio and, thus, it entered judgment in favor of the Razos.

We conclude the trial court erred, in part. Andersson could change her patio, but not in a way that affected the Razos' walkway. We, therefore, reverse the judgment and remand.

FACTS

The CC&Rs were recorded in 2001. Their recital stated their purpose was to "enforc[e], protect[] and preserv[e] the value, desirability and attractiveness of the Project." The CC&Rs defined the "'Project'" as a "'Condominium Project,'" and the "'Property'" as a "'Common Interest Development.'" The "'Property'" included the real property (Property) upon which the Razos' and Andersson's "Units" were situated. The CC&Rs defined a "'Unit'" by reference to former Civil Code section 1351, subdivision (f). That

2

section defined a "Unit" as a "separate interest in space . . . the boundaries of which are described on a recorded final map." (Former Civ. Code, § 1351, subd. (f), amended by Stats. 2000, ch. 26, § 1, and repealed by Stats. 2012, ch. 180, § 1, eff. Jan. 1, 2014.) Their description may refer to "physical boundaries, either in existence, or to be constructed, such as walls, floors, and ceilings." (*Ibid.*) On the recorded final map here, the boundaries of each Unit were depicted by lines identified as "walls." The Property also contained "'Common Area'" and "'Exclusive Use Common Area(s).'" Everything on the Property, other than a Unit, was Common Area. Exclusive Use Common Area sat within Common Area, but was space designated for an owner's exclusive use, such as a patio.

The Property and Units were built in approximately 2002. The Razos purchased their Unit in 2017. Andersson purchased her Unit in January 2020. The Units and Property were located between a street and an alley. Andersson's Unit faced the street, while the Razos had the rear Unit. Andersson's Unit included an outdoor patio which was visible from the street and was designated her Exclusive Use Common Area.

A walkway began at the street's sidewalk, meandered along the left side of the Property, and ended at the entrance to the Razos' Unit. A separate walkway also started at the sidewalk but led to Andersson's patio and ultimately to her front door. Each walkway had its own gate. The walkways were adjoined by and separated by pilasters which were connected by a wrought-iron fence. On the right of the wrought-iron fencing was Andersson's patio and walkway; immediately to the left was a decorative planter, and to the left of that was the Razos' walkway.

According to the recorded final map, Andersson's Exclusive Use Common Area was supposed to begin 50 inches from the left-side Property

3

line. However, as it was at the time Andersson purchased her Unit, the Razos' walkway, including the planter, pilasters, and wrought-iron fencing, reached 85 inches from the left-side Property line and, thus, encroach on Andersson's Exclusive Use Common Area.

A month after moving in, Andersson met with Eric Fenmore and his company, DIG Landscape Construction, Inc., dba Garden Studio with the hopes of remodeling her patio. She wanted to change the aesthetic from a "traditional Mediterranean design" to a "clean coastal look." As part of the remodel, Andersson wanted a walkway which led right to her door. However, this would have required returning the size of Andersson's patio to its originally delineated starting point of 50 inches from the left-side Property line, thus requiring a narrowing of the Razos' walkway and the destruction of the pilasters, planter, and wrought-iron fencing.

In addition to this, Andersson wanted to remodel her patio to remove an outdoor fireplace, install an outdoor firepit with seating, replace doors and windows, change the stucco and paint on her Unit, install a barbeque, change the planting and hardscape, and change the style of the wrought-iron fence, amongst other things.

Andersson signed a contract with DIG whereby she agreed to indemnify DIG from any claims, including attorney fees.

The Razos were not agreeable to Andersson's proposed changes to their walkway. Notwithstanding, Andersson instructed DIG to commence work. DIG ultimately completed the remodel including installing a fireplace, new stonework, a bench, new fencing, a new barbeque, and new landscaping. However, DIG did not change the paint or stucco on Andersson's Unit. But DIG did alter the Razos' walkway and removed the planter, pilasters, and wrought-iron fencing.

In August 2020, the Razos sued Andersson, DIG, and Fenmore for breach of the CC&Rs, prescriptive and equitable easements, and nuisance. DIG filed a cross-complaint against Andersson asserting causes of action for breach of contract, contractual indemnification, and equitable indemnity. Prior to trial, DIG and the Razos settled, and DIG assigned its claims to the Razos.

At the heart of the Razos' complaint were two CC&Rs: section 2.04(d), which prohibited an owner from changing "the exterior appearance of a Unit" without Association approval and section 2.04(e), which allowed an owner to unilaterally make "any improvement or alteration" to the owner's Exclusive Use Common Area.

Andersson and the Razos proceeded to a court trial where they each introduced experts who testified to the meaning of the CC&Rs at issue. Andersson's expert, an attorney specializing in homeowner associations, testified that, based on his reading, the Association was not required to approve changes to an owner's Exclusive Use Common Area. He did not believe section 2.04(d) had any application to the dispute between the Razos and Andersson because, in his opinion, Andersson did not make changes to her Unit's "exterior appearance."

The Razos' expert, a real estate lawyer, interpreted the phrase "exterior appearance," to refer broadly to the exterior appearance of the Property, including Exclusive Use Common Area, not just the Unit itself. Thus, the CC&Rs barred Andersson's changes to her patio, as well as the Razos' walkway, because they altered the Property's exterior appearance.

The trial court agreed with the Razos' expert and concluded that because the "express purpose of the CC&Rs [was] to 'protect[] and preserv[e] the value, desirability and attractiveness of the [Property],'" then it would be

5

unreasonable to conclude that the drafter intended to give owners the power to unilaterally change the appearance of their Exclusive Use Common Area because such lack of uniformity within the Property would diminish its "value, desirability, and attractiveness . . . ." Because, the court continued, "[s]ection 2.04(d) is the only provision expressly addressing [Association] approval for exterior changes," then it must be interpreted "expansively to require [Association] approval for changes to any portion of the exterior of the [Property]." As such, all of Andersson's changes breached the CC&Rs.

Alternatively, the court ruled the Razos had an easement over their walkway, the pilasters, the planter, and the wrought-iron fencing. Section 10.04(a) of the CC&Rs stated that if, when the Property was originally constructed, an improvement was placed in such a way that it encroached on an owner's Exclusive Use Common Area, an easement was created over the encroaching area. The court found the Razos' walkway, the pilasters, the planter, and the wrought-iron fencing were part of the original construction.

Finally, the court ruled that Andersson was responsible for defending and indemnifying DIG and Fenmore.

In February 2024, judgment was entered ordering Andersson, at her expense, to undo the changes and to pay the Razos $762,822.24.

DISCUSSION

On appeal, Andersson argues the trial court erred in concluding that "exterior appearance" included the changes made to the appearance of her Exclusive Use Common Area. On this point, we agree. However, we disagree with Andersson's contentions that the Razos did not have an easement over their encroaching walkway, planter, pilasters, and wrought-

6

iron fencing, and that she is not responsible for defending and indemnifying DIG.

## I.

### ANDERSSON COULD ALTER HER EXCLUSIVE USE COMMON AREA

We interpret CC&Rs in the same manner as any contract, "with a view toward enforcing the reasonable intent of the parties." (*Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817.) "The language of the CC&R's governs if it is clear and explicit, and we interpret the words in their ordinary and popular sense unless a contrary intent is shown." (*Ibid.*) Such contrary intent may be shown by extrinsic evidence shedding light on the ""'facts, circumstances and conditions surrounding the execution of the [CC&Rs].'" [Citations.]" (*Falkowski v. Imation Corp.* (2005) 132 Cal.App.4th 499, 506.)

If the parties offered extrinsic evidence, and that evidence was not in conflict, we review the CC&Rs de novo. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531.) If the extrinsic evidence was in conflict and required credibility determinations by the trial court, we defer to the trial court's interpretation if substantial evidence supports it. (*Id.* at pp. 531–532.)

The Razos argue the experts' testimony constituted extrinsic evidence and, thus, we are bound by the court's reliance thereon if substantial evidence supports it. But the experts did not testify to the facts, circumstances, or conditions surrounding the execution of the CC&Rs. (See e.g., *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1357 [evidence of trade usage and custom at time of contract admissible].) Instead, the experts just presented their interpretations of the CC&Rs, a solely legal function. This is not extrinsic evidence. (*Gilkyson v. Disney Enterprises, Inc.* (2021)

66 Cal.App.5th 900, 920–921 [experts testifying to their interpretation of agreement is not extrinsic evidence].)

As such, the experts' conflicting interpretations, whether relied on by the trial court or not, are not binding on us, even if substantial evidence supports one of the interpretations. Instead, we interpret the CC&Rs de novo.

Section 2.04(d) is not ambiguous. The Units are bound by their walls. Walls have an interior and an exterior. "[E]xterior appearance" just refers to the appearance of the Unit's exterior walls. For example, the owner could not paint the exterior walls a different color or change their texture, nor could an owner install windows or add a balcony, without Association approval.

Similarly, section 2.04(e) is not ambiguous. By its plain terms, it means what it says—an owner can alter their Exclusive Use Common Area without Association approval. It would be nonsensical to require an owner to get Association approval before placing plants on their patio or hanging decorative décor.

Additional support is found elsewhere in the CC&Rs. Section 2.04(c), for example, requires an owner to "notify the Association of any substantial improvements to the Unit and Exclusive Use Common Area(s), if any, in consideration of any effect of such improvements on the Association's insurance policy." Thus, per section 2.04(c), the CC&Rs contemplate a scenario in which the owner of a Unit makes "substantial improvements" to their Exclusive Use Common Area without the approval of the other owner, i.e., without Association approval.

Moreover, section 2.05 provides that "the Association (not individual Owners) is responsible for maintaining, repairing, modifying, and altering Common Areas (not including Exclusive Use Common Areas)." Thus,

the Association has no power to alter Exclusive Use Common Areas—that domain lies with the owner.

The Razos disagree and urge us to focus on the CC&Rs' recital which explains that the purpose of the CC&Rs is to maintain the desirability and attractiveness of the Units and Property. They believe section 2.04(e) must be read in such a way that it limits an Owner's ability to change their Exclusive Use Common Area if doing so would decrease the "value, desirability and attractiveness" of the Property. Such an interpretation would inevitably embroil the owners in endless disputes over minor changes.

In any event, recitals are not covenants. Nor can they affect unambiguous covenants within the contract, such as 2.04(d) and (e). (*Carolina Beverage Corp. v. FIJI Water Co., LLC* (2024) 102 Cal.App.5th 977, 990.) This is why we give recitals "'limited effect[,] even as between the parties.'" (*Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1069.)

II.

THE RAZOS HAD AN EASEMENT

The recorded final map depicted Andersson's Exclusive Use Common Area as starting 50 inches from the left-side Property line. However, during construction of the Property, the builder installed a larger walkway to the Razos' Unit, by an additional 35 inches. This included the pilasters, planter, and wrought-iron fencing that encroached Andersson's originally delineated Exclusive Use Common Area.

Sections 10.04(a) and (b) state that if, during original construction, an improvement is placed in such a way that it encroaches on an owner's Exclusive Use Common Area, an easement is created in favor of the encroaching owner. Andersson argues substantial evidence does not support the trial court's conclusion that the walkway, pilasters, planter, and

9

fence were part of the Property's original construction and, even if they were, "the record does not support the conclusion that the entire walkway was an easement that encroached on Andersson's Exclusive Use Common Area." We disagree.

We review a trial court's factual findings for substantial evidence, a highly deferential standard. (*Ridley v. Rancho Palma Grande Homeowners Assn.* (2025) 114 Cal.App.5th 788, 800.) We will not reweigh the evidence, resolve evidentiary conflicts, or evaluate the credibility of witnesses. (*Ibid.*) Instead, we review the record in the light most favorable to the trial court's factual findings, giving the trial court the benefit of every reasonable inference. (*Ibid.*)

Prior to trial, the parties stipulated that the Property and the Units were constructed in "approximately 2002." The Razos presented a photograph from 2003 which depicted the disputed area in a similar fashion to when they purchased their Unit in 2017. Although the picture is blurry and subject to interpretation, the trial court concluded that it was consistent with how the Razos' walkway stood at the time of purchase; we take no issue with that conclusion. In addition, there was evidence that the same style of wrought-iron fence was used throughout the Property, that the pilasters had the same stucco finish as the Units, and that the age and look of all the improvements in the encroaching area were consistent with the rest of the Property. This constitutes circumstantial evidence that the encroaching improvements were part of the original construction. (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 676 [circumstantial evidence is substantial evidence].)

Andersson also argues that because neither owner could walk through the planted areas, the area did not encroach on Andersson's

10

Exclusive Use Common Area. Andersson's argument belies the point of a fence—to separate two areas and to delineate a border. Andersson's Exclusive Use Common Area was to the right of the fence and everything to the left was the encroaching improvements, including the planter and the 85-inch walkway.

Because there was an easement in favor of the Razos over the wider entryway, pilasters, planter, and wrought-iron fencing, Andersson could not remove or modify those areas without Association approval.[1]

### III.

#### ANDERSSON WAS RESPONSIBLE FOR DEFENDING AND INDEMNIFYING DIG

Last, Andersson argues the trial court erred in concluding that she was responsible for defending and indemnifying DIG. She claims DIG was not licensed when DIG performed the work at issue. Because of this, according to Andersson, DIG's contract, including its indemnity provision, was illegal.

However, Andersson did not raise this defense at trial. ""As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." [Citation.] "New theories of defense, just like new

---

[1] We need not reach the question of whether Andersson's actions in removing the planter, pilasters, and fencing violated section 2.04(e)'s prohibition on an owner changing their Exclusive Use Common Area in a way that affects the structural integrity of the Property. The pilasters, planter, and wrought-iron fencing were not Andersson's Exclusive Use Common Area.

theories of liability, may not be asserted for the first time on appeal . . . ."'" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.)

This rule is especially apt here because resolving this issue would require us to make factual determinations utilizing evidence that Andersson did not present at trial. As part of her appeal, Andersson submitted a request for judicial notice pertaining to DIG's licensing documentation. But she did not present these materials to the trial court. We are not a fact-finding tribunal. Our role is limited to reviewing "'the correctness of a judgment as of the time of its rendition.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405), Thus, we will not take notice of documents not presented to the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

For these reasons, Andersson cannot assert this defense for the first time on appeal.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to enter a new judgment, consistent with this opinion. The trial court is also ordered to reassess the amount of attorney fees the Razos are entitled to receive. (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 358–359.)

All parties to bear their costs incurred on appeal.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


GOODING, J.