Filed 2/27/13  City of Hope Nat. Med. Center v. PacifiCare of Cal. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CITY OF HOPE NATIONAL MEDICAL CENTER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> PACIFICARE OF CALIFORNIA, <br><br> Defendant and Respondent. | No. B232591 <br><br> (Los Angeles County <br> Super. Ct. No. GC042334) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joseph De Vanon, Judge.  Affirmed.

Melanie Joy Young (Stephenson), Barry Sullivan, Karlene J. Rogers-Aberman and Danielle M. Cantrell for Plaintiff and Appellant.

Goodstein & Berman, Gary J. Goodstein and Bruce A. Berman for Defendant and Respondent.

_____

## INTRODUCTION

The City of Hope National Medical Center (COH) filed a complaint alleging that PacifiCare of California had breached the parties' health services contract by failing to reimburse COH for medical treatment provided to a PacifiCare plan member. PacifiCare filed a motion for summary judgment arguing that it was not contractually obligated to pay for the medical treatment because: (1) COH had failed to obtain PacifiCare's authorization prior to providing the treatment; and (2) PacifiCare had entered into capitation agreements with third party medical providers that absolved it of financial responsibility for the services rendered by COH. The trial court granted the motion for summary judgment and awarded PacifiCare attorneys' fees and costs. COH appeals the judgment and the award of attorneys' fees and costs. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of Fact Preceding the Filing of the Lawsuit*

#### *1. Summary of the parties' health services contracts*

City of Hope National Medical Center (COH) is a health care provider that specializes in the treatment of cancer. PacifiCare is a licensed health care service plan under California's Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 *et seq.*). The Knox-Keene Act defines a "health care service plan" as "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f)(1).) As a health care service plan, PacifiCare does not provide medical care directly to its subscribers; instead, it contracts with "providers"[1] to deliver services to its health plan members.

---

[1] The Knox-Keene Act defines the term "Provider" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i).)

2

In 1990, COH and PacifiCare entered into a written "Hospital Services Agreement" (HSA). Under the HSA, COH agreed to provide "medical services" to PacifiCare subscribers. PacifiCare, in turn, agreed to pay COH for these "medical services" at pre-negotiated rates that were listed in an attachment to the contract.[2] The HSA defined the term "medical services" as "all authorized health care services to which Subscribers are entitled under the PacifiCare Health Plan." The HSA also included a non-delegation clause prohibiting the parties from "subcontract[ing]" or "delegat[ing]" any of the "duties imposed [under the contract]" without "the written consent of the other party."

In 1994, PacifiCare entered into a separate "capitation agreement" with Monarch Healthcare, which is an "independent practice association" (IPA).[3] The capitation agreement required Monarch to arrange for and provide medical services for certain PacifiCare subscribers. In exchange, PacifiCare paid Monarch a fixed monthly fee for each assigned subscriber. The capitation agreement served as a "risk-sharing plan" through which PacifiCare attempted to delegate a portion of its payment responsibilities to Monarch. (See *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1136 [describing capitation agreements as "risk sharing plan" through which "health care service plans . . . delegate payment responsibility to contracting medical providers"]; *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1163 [describing capitation agreements]; 42 C.F.R.

---

**2** Section 3.01 of the contract provides that COH "agrees to provide Hospital Services to [PacifiCare] Subscribers. . . ."; section 5.01 provides that "PacifiCare shall make payments to [COH] for the provision of Hospital Services . . . as outlined in Attachment A attached hereto and incorporated herein by reference." Section 1.06 defines the term "Hospital Services" as "Medical Services described in Attachment A and Attachment D . . ."

**3** The Knox-Keene act defines the term ""IPA" by reference to title 42 United States Code section 300e-1(5), which provides in pertinent part: "The term 'individual practice association' means a . . . legal entity which has entered into a services arrangement (or arrangements) with persons who are licensed to practice medicine . . ." (See Health & Saf. Code §1373, subdivision (h)(6).)

422.208 [defining "capitation" as "a set dollar payment per patient per unit of time (usually per month) paid to a physician or physician group to cover a specified set of services and administrative costs without regard to the actual number of services provided. The services covered may include the physician's own services, referral services, or all medical services"].)

In 2005, PacifiCare entered into a "split capitation agreement" with a hospital facility named Fountain Valley Regional Medical Center (FVRMC). Under the split capitation agreement, FVRMC agreed to provide some forms of health care services to PacifiCare subscribers who had been assigned to Monarch through the PacifiCare/Monarch capitation agreement. Specifically, FVRMC agreed to provide services associated with hospital and medical facilities, while Monarch retained financial responsibility for costs associated with medical professionals.

### 2. COH's medical treatment of PacifiCare subscriber

In August of 2006, a member of PacifiCare's "Secure Horizons" health plan was admitted to COH for treatment of leukemia. The patient fell within a class of subscribers who were subject to PacifiCare's capitation agreements with Monarch and FVRMC. COH obtained authorization for treatment from Monarch, which had referred the patient to the hospital. Monarch's authorization form indicated that the patient was a member of the "Secure Horizons" plan.

Three weeks after the patient was admitted, COH sent PacifiCare an interim billing statement requesting payment for approximately $130,000 of medical services. Four weeks later, on October 9, 2006, COH provided a second interim billing statement requesting payment of an additional $530,000. On October 25, PacifiCare sent COH a letter indicating that, pursuant to its capitation agreements, Monarch was financially responsible for reimbursing the patient's medical services. After receiving the letter, COH sent a copy of all further billing statements to Monarch.

In November of 2006, COH sent PacifiCare its final invoice for the patient's medical services, which totaled in excess of $1.5 million. In December of 2006, FVRMC

4

paid COH approximately $115,000 for its portion of the services, which COH accepted. A year later, COH sent PacifiCare a letter stating that it still owed the hospital approximately $1 million pursuant to the terms of the HSA.

### B. COH's Complaint and PacifiCare's Motion for Summary Judgment

On February 1, 2009, COH filed a complaint for breach of contract and quantum meruit arising from PacifiCare's refusal to reimburse the patient's medical services. COH initially claimed that it was owed $992,000 in unpaid medical services, but later reduced its demand to approximately $350,000. PacifiCare then filed a cross-complaint against FVRMC, which the court referred to arbitration pending the outcome of COH's claims.[4]

On January 14, 2011, PacifiCare filed a motion for summary judgment arguing that COH's contract claim "failed as a matter of law for two reasons." First, PacifiCare contended that the undisputed evidence demonstrated that the patient who had received treatment was "part of a group of PacifiCare members" who were subject to its capitation agreements with FVRMC and Monarch. According to PacifiCare, these capitation agreements "delegated the financial risk of treatment" to Monarch and FVRMC, thereby relieving PacifiCare of any "contractual obligation" owed to COH.

Alternatively, PacifiCare argued that it was not obligated to pay for the patient's medical services because the COH had failed to obtain authorization prior to administering treatment. PacifiCare relied on language in the HSA defining the term "medical services" as "all authorized health care services." Although PacifiCare

---

[4] FVRMC also filed a cross-claim against COH seeking reimbursement of a portion of the $115,000 that it had previously paid for the patient's hospital services. COH eventually agreed to reimburse FVRMC $62,000 and the parties dismissed the cross-complaint.

5

admitted that COH had obtained authorization from Monarch, it argued that "COH was entitled to receive the contract rates *only* if the authorization came from PacifiCare."[5]

In its opposition, COH asserted that both of PacifiCare's arguments lacked merit. First, COH argued that PacifiCare's capitation agreements with Monarch and FVRMC did not relieve it of its contractual obligations under the HSA. COH explained that section 12.05 of the contract "expressly prohibited" PacifiCare from "delegating its [financial] responsibilities . . . without COH's written consent." COH also argued that PacifiCare had failed to "cite to any specific provision in the [HSA]" authorizing capitation to a third party with whom COH had no contractual relationship.

Second, COH contended that, prior to administering treatment, it had properly obtained authorization from Monarch. Although COH acknowledged that the HSA only obligated PacifiCare to pay for "authorized" health services, it argued that the contract did not contain any language requiring "that the authorization must come from PacifiCare." According to COH, "so long as the treatment was authorized (and here, there is no dispute that it was [authorized by Monarch]), PacifiCare was obligated to pay . . ." Alternatively, COH argued that it was "reasonably led to believe that" that PacifiCare had permitted Monarch to provide authorization for the patient's medical treatment.

In support of its opposition, COH submitted the declaration of Michael Rabin, who served as COH's vice president of "Managed Care and Business Operations." Rabin's declaration stated that the HSA included language that "makes clear PacifiCare's obligations . . . cannot be effectively assigned to a third party, or subcontracted or delegated without City of Hope's written consent. . . .[¶] At no time has [COH] ever provided consent to PacifiCare written or otherwise, to subcontract, delegate or assign its obligations under the [HSA] to a third party."

---

[5]     PacifiCare also argued that it was entitled to summary judgment on COH's claim for quantum meruit. COH's appeal, however, does not raise any issue related to that claim.

Rabin's declaration further stated: "Although the [HSA] requires that PacifiCare issue *payment* for *authorized* care, it does not dictate that *PacifiCare* issue the *authorization* itself. In this instance, authorization for the patient's treatment was requested from and provided to [COH] by Monarch . . . The treatment authorization clearly identifies the patient's health plan as "*Secure Horizons*" . . . Because the Secure Horizons plan is the plan offered by PacifiCare, and of which the patient at issue was a member, this indicated a relationship of some kind between PacifiCare and Monarch. Thus, requesting the authorization from Monarch was in the eyes of [COH] no different from contacting PacifiCare, and having the authorization come from Monarch was in no way unusual. . . . . [¶] [I]n my experience, health plans *routinely* delegate their utilization review and authorization functions to third parties while at the same time maintaining financial responsibility for payment for services rendered to their plan beneficiaries."[6]

After hearing argument, the trial court entered an order granting PacifiCare's motion for summary judgment. The court concluded that the HSA only "obligated PacifiCare to pay for authorized care, which the court interpret[ed] to mean care authorized by PacifiCare." The court further concluded that COH had failed to submit any "admissible evidence" that PacifiCare had authorized the patient's treatment or that Monarch had been acting as "PacifiCare's agent" at the time it authorized the treatment[7]

### C. *PacifiCare's Memorandum of Costs and Motion for Attorneys' Fees*

Following entry of judgment, PacifiCare filed a motion for attorneys' fees and a memorandum of costs pursuant to a provision in the HSA. PacifiCare's motion for attorneys' fees requested approximately $320,000 for legal services that had been

---

[6] The trial court sustained PacifiCare's objections to large portions of Rabin's declaration. Because COH has not appealed that evidentiary ruling, our legal analysis will not consider any portion of Rabin's declarations that was subject to PacifiCare's objections.

[7] The trial court also heard and denied COH's cross-motion for summary judgment, which asserted that the evidence established that PacifiCare had breached the HSA by refusing to pay for the patient's health services. COH's appeal only addresses issues related to PacifiCare's motion for summary judgment.

provided by two law firms. In support of the motion, PacifiCare submitted billing statements demonstrating that its attorneys had charged approximately $271,000 for their services. Although these records indicated that the two lead attorneys had charged PacifiCare an hourly rate of $350 and $325 respectively, PacifiCare argued that the attorneys were reasonably entitled to hourly rates of $500 and $400, which amounted to a $50,000 increase in the fee award. PacifiCare's memorandum of costs sought reimbursement of an additional $10,000 for filing fees, deposition costs and miscellaneous fees.

COH argued that the court should deny attorneys' fees and costs because PacifiCare's had not filed its motion or memorandum within the time limits provided in California Rules of Court 3.1700 and 1.3702. COH also argued that the amount of fees PacifiCare had requested was excessive and that many of the costs were not reasonably necessary to the litigation.

After hearing argument, the trial court granted PacifiCare's motion for attorneys' fees and awarded it approximately $271,000. The trial court also granted COH's motion to tax costs in part, striking all of the "miscellaneous" costs (which amounted to $4,700) and $440 in filing fees.

COH filed timely appeals of the trial court's judgment granting PacifiCare's motion for summary judgment and its order awarding attorneys' fees and costs.

## DISCUSSION

### A. *COH Has Failed to Establish the Existence of a Disputed Issue of Material Fact Regarding PacifiCare's Alleged Breach of the HSA*

COH argues that the trial court erred in concluding that it failed to establish the existence of a disputed issue of material fact as to whether PacifiCare breached the HSA.

#### 1. *Standard of review*

"A trial court should grant summary judgment 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to

8

a judgment as a matter of law.' [Citation.] A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. [Citation.] Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]

"'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained. [Citations.]' [Citation.] We view the evidence and the inferences reasonably drawn from the evidence 'in the light most favorable to the opposing party.' [Citations.]" (*Neiman v. Leo A. Daly Co*. (2012) 210 Cal.App.4th 962, 967-968.)

### 2. *PacifiCare is entitled to summary judgment because COH has provided no evidence that PacifiCare authorized the patient's medical treatment*

The trial court ruled that PacifiCare was entitled to summary judgment because: (1) the HSA only obligated PacifiCare to pay for medical services that it had authorized; and (2) COH had failed to provide any admissible evidence that PacifiCare or its agent had authorized the patient's medical treatment. COH appeals both of these findings.

First, COH argues that it was permitted to rely on Monarch's authorization because the HSA does not contain any language restricting who may authorize medical treatment. Alternatively, COH argues that it introduced evidence establishing a disputed issue of material fact as to whether Monarch was acting as PacifiCare's "ostensible agent" at the time Monarch authorized the care.

### a. *The HSA only obligates PacifiCare to pay for medical services that it authorized*

The HSA requires PacifiCare to pay COH for the provision of "medical services," which is defined to include "all authorized health care services to which Subscribers are

9

entitled under the PacifiCare Health Plan." The parties agree that this provision only obligates PacifiCare to reimburse COH for health care services that are "authorized." They also agree that, in this case, COH obtained authorization from Monarch, not PacifiCare. They disagree, however, as to whether the contract permitted COH to rely on authorization from Monarch, who was not a party to the contract.

COH argues that the HSA does not contain any language that "restrict[s] the entity that can make an 'authorization.'" Therefore, Monarch's authorization was sufficient to trigger PacifiCare's payment duties. PacifiCare, however, argues that the HSA clearly implies that "it [i]s the only entity that could provide such an authorization."

### i. *Applicable principles of contract interpretation*

"'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' [Citation.]" (*State of California v. Continental Ins. Co*. (2012) 55 Cal.4th 186, 195.) Contract language is ambiguous when it is susceptible to two or more reasonable constructions. (*E.M.M.I. Inc. v. Zurich American Ins. Co*. (2004) 32 Cal.4th 465, 470.) "'[W]here the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract.'" (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544.)

"To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027.) "The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." (*Strong v. Theis* (1986) 187 Cal.App.3d 913, 920.)

"Custom and usage of words in a certain trade are admissible to explain the meaning of the terms used in a contract" (*Horsemen's Benevolent & Protective Assn. v.*

10

*Valley Racing Assn*. (1992) 4 Cal.App.4th 1538, 1560 (*Horsemen's*)) or "to supply a missing term." (*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc*. (1988) 205 Cal.App.3d 442, 451; see also *Varni Bros. Corp. v. Wine World, Inc*. (1995) 35 Cal.App.4th 880, 889 (*Varni*) ["'Usage or custom may be looked to, both to explain the meaning of language and to imply terms . . . .'"].) "Custom and usage may not[, however,] be used to vary the terms of the contract." (*Horsemen's, supra*, 4 Cal.App.4th at p. 1560.)

"The ultimate construction placed on the contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence. [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport* (2003) 109 Cal.App.4th 944, 955.)

> ### ii. *The HSA requires COH to obtain PacifiCare's authorization for medical services*

The HSA does not contain any language explaining who may provide the "authorization" that triggers PacifiCare's payment obligation. It states only that PacifiCare is obligated to pay for "all authorized health care services to which Subscribers are entitled under the PacifiCare Health Plan." Based solely on the language of the contract, neither of the parties' proposed constructions are unreasonable. Given the absence of any language indicating who may issue the authorization, the contract could, as COH contends, be reasonably interpreted as imposing no restrictions on who may provide the authorization. On the other hand, because the act of authorization imposes financial obligations on PacifiCare, it would be reasonable to conclude that, although not directly stated, the parties intended that the authorization must come from PacifiCare.

11

Although "both proposed interpretations are facially reasonable" (*Falkowski v. Imation Corp.* (2005) 132 Cal.App.4th 499, 509 (*Falkowski*), the application of "canons of construction, including consideration of extrinsic evidence of the parties' intent" (*Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 589, fn. 2), demonstrate that the term "authorization" is properly interpreted as authorization from PacifiCare, rather than authorization from any entity. (See *Falkowski, supra,* 132 Cal.App.4th at pp. 508-510 [utilizing canons of interpretation and extrinsic evidence to resolve "facial[]" ambiguity].)

"[T]o resolve [an] arguable ambiguity . . . , [courts] . . . . may consider any extrinsic evidence bearing on the interpretation of th[e disputed] provision." (*PV Little Italy, LLC v. MetroWork Condominium Assn*. (2012) 210 Cal.App.4th 132, 160; *Newport Beach Country Club, supra,*109 Cal.App.4th at p. 955 ["Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible"].) In the trial court, PacifiCare submitted an expert declaration stating that, when contracting with providers, health care service plans utilize the authorization requirement as a way to maintain control over their financial obligations. The expert explained that if a health care service plan did not retain the "power and responsibility" over authorization, it "would not have sufficient control over the entire process to ensure the appropriateness of treatment and hence properly manage the cost of any payment for the services rendered." Based on this evidence, the traditional purpose of the authorization requirement would be greatly undermined if, as COH contends, entities other than PacifiCare were entitled to provide the authorization for health services.

PacifiCare's expert declaration also states that, in the context of managed care contracts, the "responsibility for issuing an authorization" is customarily "linked to the party that is" responsible for paying for the authorized medical care. (See *Varni Bros., supra,* 35 Cal.App.4th at p. 889 ["'Usage or custom may be looked to, both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract.'"].) Because PacifiCare is the entity responsible for paying for

12

authorized health services, this custom and usage evidence supports PacifiCare's interpretation of the HSA.

COH has not presented any evidence disputing PacifiCare's assertions regarding the traditional purpose of the authorization requirement or the customary usage of the term "authorization." The only evidence COH submitted on this issue is a statement from Michael Rabin's declaration asserting that, in his "experience, health plans routinely delegate their utilization review and authorization functions to third parties." This statement does not refute PacifiCare's extrinsic evidence. Indeed, Rabin's allegation implicitly acknowledges that the authority to authorize treatment generally resides with the health care service plan, which may then elect to delegate that authority to another party.[8]

PacifiCare's proposed construction also finds support under traditional canons of contract interpretation. Generally, "[c]ourts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473.) COH asserts that the phrase "authorized health care services" does not restrict who may authorize the medical services in any way. Under this seemingly boundless interpretation, COH or the patient could authorize the health services, which would effectively render the "authorization" requirement meaningless. Any health service that COH has provided to a patient has necessarily been authorized by COH or another entity. Thus, reading the term "authorized health services" in a manner that permits any entity to provide authorization would effectively render the term "authorized" mere surplusage. (See *Farmers Ins. Exchange v. Knopp* (1996) 50 Cal.App.4th 1415, 1421 [rejecting interpretation that rendered language in the contract "superfluous and redundant"]; *Super 7 Motel*

---

**8** COH has not argued that PacifiCare should be bound by Monarch's authorization because it delegated that duty to Monarch pursuant to the capitation agreement. Instead, it argues only that: (1) the language of the HSA permitted COH to rely on authorization from a third party entity; and (2) Monarch was acting as PacifiCare's ostensible agent at the time of the authorization.

13

*Associates v. Wang* (1993) 16 Cal.App.4th 541, 546 [rejecting interpretation that would render language in the contract "redundant and unnecessary"].)

Courts must also avoid interpretations that "would make a contract unusual and extraordinary" when "another construction, equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail.' [Citation.]" (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 184.) The interpretation set forth by PacifiCare is a more reasonable and fair interpretation of the parties' contract. Under COH's interpretation, entities that have no relation to either the contract or PacifiCare could provide the authorization that triggers PacifiCare's payment duty. Given that PacifiCare is ultimately responsible for arranging its subscribers' health services and paying providers for those services, the more reasonable interpretation of the HSA is that PacifiCare is the entity responsible for authorizing the provision of health services.

### b. *COH failed to introduce any evidence establishing a material issue of disputed fact as to ostensible agency*

COH argues that, even if we accept PacifiCare's interpretation of the HSA, it has introduced evidence establishing that there is a disputed issue of material fact as to whether Monarch was acting as PacifiCare's "ostensible agent" when it authorized the patient's medical care.

"Ostensible agency" is a form of vicarious liability that applies "when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) "Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met: The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged and the person relying on the agent's apparent authority must not be negligent in holding that belief. [Citations.] Ostensible agency cannot be established by the representations or conduct of the purported agent;

14

the statements or acts of the principal must be such as to cause the belief the agency exists. [Citations.] ""Liability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,' the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury. [Citation.]" [Citation.]' [Citation.]" (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 404 (*J.L.*).)

Although the existence of an "ostensible agency" is generally a question of fact (see *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 748), it is an appropriate issue for summary judgment where "the facts can only be viewed in one way." (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658; *J.L., supra*, 177 Cal.App.4th at pp. 403-405 [plaintiff failed to establish material issue of fact on question of ostensible agency].)

COH contends that three pieces of evidence create a triable issue of fact on the question of ostensible agency. First, COH relies on Monarch's authorization form, which contains a header at the top, right-hand corner of each page with a line stating "Health Plan: Secure Horizons-HMO Tenet." The parties do not dispute that "Secure Horizons" is the name of the patient's PacifiCare health plan. COH contends that, based on the information in the authorization form's header, a "trier of fact could make a reasonable inference that Monarch simply was performing . . . [authorization for PacifiCare]." Ostensible agency however, "cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the belief the agency exists. [Citations]." (*J.L., supra,*177 Cal.App.4th at p. 404; see also *Robinson v. Harry* (1935) 7 Cal.App.2d 312, 315 ["ostensible agency may not be established by the declarations of the agent himself"].) COH has introduced no evidence indicating that PacifiCare directed Monarch to include this information on the authorization form or had knowledge that Monarch had done so.

Second, COH relies on a statement in a declaration from Michael Rabin, a COH employee whose responsibilities include "maintain[ing] patient financial records" and "making sure that [COH] gets paid the correct amount of money under applicable

contracts." According to Rabin, "it is a routine practice in the healthcare industry for an entity such as PacifiCare to delegate the utilization review function while retaining responsibility for payment." This evidence does not demonstrate that PacifiCare made any statement or omission that caused COH to believe that Monarch was acting as its agent. Although the evidence might be relevant in determining whether COH could have reasonably relied on an act or omission by PacifiCare indicating that Monarch was its agent, the evidence does not raise a triable issue of fact as to whether PacifiCare actually committed any such act or omission.

Third, COH relies on evidence demonstrating that, after receiving interim billing statements requesting payment for patient's care, PacifiCare waited several weeks before informing COH that Monarch was responsible for the payments. COH's evidence indicates that Monarch authorized treatment on August 16, 2006. On September 8 and October 9, COH sent PacifiCare billing statements for medical services provided to the patient. On October 25, PacifiCare provided a letter informing COH that it was not financially responsible for the services.

COH's assertion that the trier of fact could reasonably infer ostensible agency based on PacifiCare's delay in responding to billing statement fails. It is undisputed that COH did not send PacifiCare the first interim billing statement until several weeks after it had accepted Monarch's authorization and begun administering care. Therefore, PacifiCare's subsequent delay in responding to the billing statements could not have caused COH to believe Monarch was acting as PacifiCare's agent at the time it authorized the care.[9]

---

9    In some cases, a principal's silence in the face of actual knowledge of an alleged agent's actions may be sufficient to give rise to a finding of ostensible authority. (*See Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 439 ["where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability [under theory of ostensible agency]"; *Tomerlin v. Canadian Indem. Co.* (1964) 61 Cal.2d 638, 644-645.) Here, however, COH has not introduced any evidence that PacifiCare had knowledge of Monarch's authorization prior to receiving the interim billing statements. Therefore, there is no evidence that PacifiCare caused COH to rely on Monarch's authorization.

In sum, we affirm the trial court's conclusion that: (1) the HSA only obligated PacifiCare to pay for health services that it had authorized; and (2) the COH failed to establish a triable issue of fact as to whether Monarch was acting as PacifiCare's ostensible agent at the time it authorized the patient's health care. PacifiCare is therefore entitled to summary judgment on COH's breach of contract claim.[10]

## B. *The Trial court Did Not Abuse its Discretion in Calculating Attorneys' Fees or Costs*

### 1. *COH has failed to demonstrate that the trial court abused its discretion in awarding attorneys' fees*

#### a. *Factual and procedural summary*

The HSA contains an attorneys' fees provision that states: "If any action at law or suit in equity is brought to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and reasonable costs, together with interest thereon at the highest rate provided by law . . . ." After the court entered judgment, PacifiCare filed a motion seeking approximately $320,000 in attorneys' fees.

In support of its motion, PacifiCare's submitted billing records demonstrating that: (1) it had been billed approximately $271,000 in attorneys' fees; and (2) the two lead attorneys in the litigation had charged an hourly rate of $350 and $325 respectively. PacifiCare also submitted an expert declaration asserting that, given their level of experience and expertise, the two lead attorneys should be compensated at an hourly rate of $500 and $400 respectively, raising the requested attorneys' fee award to approximately $320,000.

In its opposition, COH argued that the court should deny fees because PacifiCare's motion was untimely. COH contended that, under the time limits provided in California

---

**10** COH argues at length that the trial court erred in concluding that the HSA permits PacifiCare to delegate its payment responsibilities to third parties such as Monarch or FVRMC without first obtaining COH's written authorization. Having concluded that COH failed to establish a triable issue of fact as to whether PacifiCare was obligated to pay for the patient's medical services, we need not address whether the HSA would have permitted PacifiCare to delegate that payment responsibility to a third party.

17

Rule of Court 3.1702, subdivision (a), PacifiCare was required to file and serve its motion by Monday, May 9, 2011. PacifiCare, however, did not file the motion until May 10 and did not serve the motion on opposing counsel until May 16.

COH also argued that the amount of PacifiCare's fee request was excessive because: (1) PacifiCare provided insufficient evidence to justify increasing the lead attorneys' billing rates above the rates they had charged to their client; (2) COH's claims were not complicated and the amount of damages at issue was minimal; (3) PacifiCare had sought reimbursement for numerous tasks that were not necessary to the litigation; and (4) the billing statements contained several inconsistencies.

In its reply brief, PacifiCare conceded that its motion had not been filed or served within the time limits imposed under Rule 3.1702, but argued that it had good cause for the delays. In support, PacifiCare's lead counsel submitted a declaration stating that: (1) his mother was unexpectedly hospitalized the weekend before the motion was due; (2) he had experienced technical problems with his computer the morning of May 9th; and (3) a messenger traveled to the court to file the motion on May 9, but arrived after the filing window was closed. In regards to the untimely service, the declaration explained that the attorney's temporary secretary told him and other attorneys that she had mailed the motion on May 9. The temporary secretary, who stopped working at the firm on May 20, provided a declaration stating that she had served the motion by mail on May 9 and that she had informed attorneys she mailed the motion on that day. Although PacifiCare acknowledged that COH's evidence cast doubt on whether the secretary had actually mailed the motion on May 9, it argued that its attorneys reasonably relied on her representations. PacifiCare also argued that the court should accept its untimely motion because COH was not prejudiced by the minimal delay in the filing and service.

After hearing argument, the trial court granted PacifiCare approximately $271,000 in attorneys' fees. The court explained that PacifiCare's attorneys were not entitled to an increase in their billing rates because they had failed to meet several filing deadlines.

18

### b. *The trial court did not abuse its discretion in awarding attorneys' fees*

On appeal, COH does not dispute that the HSA includes an enforceable attorneys' fees provision or that PacifiCare was the prevailing party in this matter. It argues, however, that: (1) PacifiCare is not entitled to attorneys' fees because its motion was untimely; (2) the trial court's award was excessive.

### i. *The trial court did not abuse its discretion in finding that PacifiCare had established good cause to extend the time limits in Rule 3.1702*

COH argues that PacifiCare is precluded from recovering attorneys' fees because it did not file or serve its motion within the time limits imposed by California Rule of Court 3.1702, subdivision (b). According to COH, the motion was due Monday, May 9, 2011, but was not filed until the morning of May 10 and was not served by mail until May 16.

COH, however, does not address subdivision (d) of Rule 3.1072, which states: "For good cause, the trial judge may extend the time for filing a motion for attorney's fees in the absence of a stipulation . . . ." Under this provision, a trial court has discretion to accept an untimely motion for fees upon a showing of good cause. (See, e.g., *Lewow v. Surfside III Condominium Owners' Association* (2012) 203 Cal.App.4th 128 [under subdivision (d), the trial court did not abuse its discretion when it permitted attorney to file a motion "two days late" where delay was caused by misinterpretation of a "complex" tolling-provision].) We review the trial court's decision to extend the time for filing the attorneys' fees motion under the abuse of discretion standard. (Cf. *Lucci v. United Credit & Collection Co.* (1934) 220 Cal. 492, 495 [trial court's decision pursuant to statute permitting "an extension . . . 'upon good cause shown'" reviewed for "abuse of discretion"].)

The trial court did not abuse its discretion in concluding that the unexpected illness of the counsel's mother, combined with technology complications, constituted good cause to excuse a one day delay in filing the motion. (*Cf. Robinson v. Varela*

(1977) 67 Cal.App.3d 611, 616 (*Robinson*) [under Civil Code section 473, trial court did not abuse its discretion in accepting an untimely answer based on lead counsel's sickness]; *Huh v. Wang* (2007) 158 Cal.App.4th 1406, 1424 ["'glitch in machinery'" may be sufficient to excuse untimeliness under section 473].) Nor did it abuse its discretion in concluding that PacifiCare's evidence that a temporary secretary told multiple attorneys she mailed the motion on May 9 established good cause for the delay in service. (*Ibid.* [listing numerous cases in which relief was awarded under section 473 based on "'error[s] by clerical staff'"].) The trial court's decision to extend the time for filing and service is also supported by the fact that the delays at issue were minimal and COH failed to demonstrate that it had suffered any prejudice.[11]

> ii. *The trial court did not abuse its discretion in setting the amount of attorneys' fees*

COH also argues that the trial court erred in setting the amount of the attorneys' fees award. "It is well settled that a trial court is vested with wide discretion in fixing the amount to be awarded to a prevailing party for attorneys' fees, and that a court's award will not be disturbed on appeal unless the record discloses an abuse of discretion. [Citation.]" (*Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1321.) "'[A]n experienced trial judge is in a much better position than an appellate court

---

[11]     COH argues that we should reverse the trial court's discretionary extension of the filing deadline based on the holding in *Henderson v. Pacific Gas & Elec. Co.* (2010) 187 Cal.App.4th 215. In *Henderson*, the trial court refused to accept an untimely filing that was caused by the negligent acts of a paralegal. On appeal, the plaintiff argued that it was entitled to discretionary relief from the filing deadline pursuant to Code of Civil Procedure section 473, subdivision (b). The appellate court disagreed, explaining "we cannot say that the court abused its discretion when it concluded [the attorney's] conduct was inexcusable and did not merit relief under section 473(b)." (*Id.* at p. 232.) In this case, however, the trial court granted PacifiCare an extension; therefore, the issue on appeal is whether the court abused its discretion in granting relief. Based on the wide discretion afforded to it under Rule 3.1072, subdivision (d), we find no abuse in the court's decision to afford relief under the circumstances presented here. (See *Robinson*, *supra,* 67 Cal.App.3d at p. 616 [given the broad discretion available to it under section 473, subdivision (b), trial court would have been justified in granting or denying relief].)

to assess the value of the legal services rendered in his or her court, and the amount of a fee awarded by such a judge will therefore not be set aside on appeal absent a showing that it is manifestly excessive in the circumstances.' [Citation.] 'The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.' [Citation.]" (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1509.)

COH argues that there are several reasons why we should reduce PacifiCare's attorneys' fees award. First, it asserts that PacifiCare is not entitled to fees that were incurred preparing cross-claims against Monarch and FVRMC. COH contends that both these cross-claims were subject to automatic arbitration, and therefore were not reasonably necessary to the litigation. This argument is presented in a single paragraph that does not contain a single citation to the record or to any case law.

Generally, when "challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice. Failure to raise specific challenges in the trial court forfeits the claim on appeal." (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee* (2008) 163 Cal.App.4th 550, 564.) Because COH has not cited to any evidence indicating the amount of fees (if any) that PacifiCare sought for preparing its cross-claims, nor any case law in support of its assertion that awarding such fees would be improper, it has forfeited this argument.

COH next argues that we should lower PacifiCare's award because defense counsel "exhibited a pattern of irresponsibility in handling the case by failing to adhere to established court deadlines on four separate occasions, prejudicing [COH]." Again, COH fails to explain what four "deadlines" were missed during the course of the litigation or

21

how COH was prejudiced by such conduct. Therefore, we need not address this argument.[12]

COH also argues that the fee award, which totaled approximately $271,000, was unreasonable in light of the limited damages at issue, which, according to COH, was about $350,000. We reject this argument for two reasons. First, COH admits that it initially sought almost $1 million in damages. Approximately one year into the litigation, however, it conceded that over two-thirds of those damages were not recoverable because they involved an experimental clinical trial that was not subject to the parties' contract. Therefore, COH's premise that the amount of fees awarded is grossly disproportionate to the amount of damages sought is simply not accurate.

Second, COH has cited no case requiring that there be proportionality between the amount of fees awarded to a prevailing defendant and the amount of damages sought by the plaintiff. Presumably, the amount of damages sought is a factor the court may consider when fashioning a "reasonable attorneys' fees" award. But COH has cited no case law that requires the court to impose strict proportionality. Given the complexity of the case, the discovery that was required and the cross-motions for summary judgment, we find no abuse of discretion in the size of the award.

Finally, COH argues that "the trial court's award of $271,963.76 in fees to PacifiCare was an abuse of discretion because it is unclear how the court arrived at this figure." However, under California law, there is no requirement that "trial courts . . . explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount. The absence of an explanation of a ruling may make it more difficult for an appellate court to uphold it as reasonable, but we will not presume error based on such an omission. . . . In the absence of evidence to the contrary, we presume that the trial court considered the relevant factors. [Citation.]"

---

**12** Other portions of COH's brief indicate that PacifiCare's motion for attorneys' fees and memorandum of costs were not filed within the time limits imposed under the California Rules of Court. However, COH has not cited any evidence indicating that the trial court awarded PacifiCare any fees incurred in preparing either of those filings.

22

(*Gorman v. Tassajara Development Corp*. (2009) 178 Cal.App.4th 44, 67.)  Here, COH has pointed to no evidence demonstrating that the court failed to consider the relevant lodestar factors.

Moreover, although the trial court did not expressly state how it calculated the fee award, the record demonstrates that it did not select an arbitrary figure.  The trial court's award–approximately $271,000–corresponded to the amount indicated on the billing statements that PacifiCare filed in support of its fee motion.  Although PacifiCare submitted declarations and other evidence suggesting it was entitled to a higher award than the amount billed, the trial court concluded that no such increase was warranted.

### 2.  *The trial court did not abuse its discretion in awarding costs*
#### a.  *Factual and procedural summary*

On March 9, 2011, PacifiCare mail served COH a copy of the Notice of Entry of Judgment.  On March 28, PacifiCare filed and served a memorandum of costs, which sought reimbursement for filing and motion fees (approximately $1,640), deposition costs (approximately $3,100) and miscellaneous fees for mediator payments, messenger services and document production (approximately $4,700).

In response, COH filed a motion to tax costs arguing that PacifiCare's memorandum was untimely.  COH asserted that California Rule of Court 3.1700(a)(1) required the memorandum to be filed and served within 15 days after the date on which PacificCare had served the notice of entry of judgment, which occurred on March 9.  Thus, under COH's calculation, the memorandum was due on March 24, but had not been filed until March 28.  In addition, COH argued that several costs, including the $4,700 in "miscellaneous" costs, were not necessary to the litigation.

The trial court granted the motion to tax costs in part, striking all of the miscellaneous costs (requests for mediation fees, messenger services, document production) and $440 filing fees.

### b. *The trial court did not abuse its discretion in awarding PacifiCare a portion of its costs*

COH argues that PacifiCare is not entitled to recover any costs because its memorandum was not filed within the time limits described in Rule of Court 3.1700, subdivision (a), which states, in relevant part: "A prevailing party who claims costs must serve and file a memorandum of costs within 15 days after . . . the date of service of written notice of entry of judgment." The parties do not dispute that PacifiCare served the notice of entry of judgment by mail on March 9, 2010, and then filed and served the memorandum of costs on March 28, 2010. COH argues that the memorandum was untimely because, under Rule 3.1700, it had to be filed by March 24, 2010.

PacifiCare, however, argues that the trial court was authorized to accept the memorandum under Rule 3.17000, subdivision (b)(3), which states: "the court may extend the times for serving and filing the cost memorandum . . . for a period not to exceed 30 days." "Under this rule, a trial court may grant the extension on its own motion. [Citation.] The rule does not require that the party expressly request the extension, or that the court specifically state that it granted the extension. A trial court is presumed to know and understand the applicable law. [Citation.]" (*Cardinal Health 301, Inc. v. Tyco Electronics Corp*. (2008) 169 Cal.App.4th 116, 155 (*Cardinal Health*).)

In *Cardinal Health, supra,* 169 Cal.App.4th 116, the trial court granted an award of costs pursuant to a memorandum that was filed approximately two weeks after the deadline imposed under Rule 3.1700, subdivision (a). Although there was no affirmative evidence in the record indicating that the trial court had elected to extend the filing deadline pursuant to subdivision (b)(3), the appellate court upheld the award, explaining "[w]e necessarily infer from the court's ruling that it granted . . . a 30–day extension to file the cost memorandum under Rule 3.1700(b)(3)." COH has not presented any argument as to why subdivision (b)(3), or the holding in *Cardinal Health*, are inapplicable here.

COH also challenges the trial court's decision not to tax various costs. "Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial

24

court and its decision is reviewed for abuse of discretion." (*Acosta v. SI Corp*. (2005) 129 Cal.App.4th 1370, 1380.) "[T]rial courts have a duty to determine whether a cost is reasonable in need and amount. However, absent an explicit statement by the trial court to the contrary, it is presumed the court properly exercised its legal duty. [Citation.'' [Citation]." (*Ibid*.)

COH argues that the court should have struck several fees including: (1) a $145 filing fee for a cross-complaint against Monarch and FVRMC; (2) a $40 filing fee for a notice of motion to consolidate arbitrations; (3) costs associated with a second day of the deposition of Michael Rabin, who provided a declaration in support of COH's motion for summary judgment. COH has not cited or discussed any legal authority in support of its assertion that it was an abuse of discretion to award these costs. Indeed, the subsection of COH's brief that discusses these costs is devoid of a single legal citation. As a result, we will not address these arguments.

## DISPOSITION

The trial court's judgment and order awarding PacifiCare costs and attorneys' fees are affirmed. PacifiCare shall recover its costs on appeal.

ZELON, J.

We concur:

WOODS, Acting P. J.

JACKSON, J.

25